KING, Justice,
for the Court:
¶ 1. This Court is asked to decide whether the Mississippi Department of Health (Department) erred by denying the eertificate-of-need (CON) application of St. Dominic-Jackson Memorial Hospital (St. Dominic). In its CON application, St. Dominic sought to relocate seventy-one general acute-care beds from its Jackson location to a new facility it planned to build in Madison County. The Department found that St. Dominic’s proposed project was actually a new hospital, not a relocation. Because St. Dominic did not meet the need criteria for a new hospital, the Department denied the request. The Madison County Chancery Court affirmed this decision.
¶ 2. Aggrieved, St. Dominic has appealed to this Court, raising four issues:
I. Whether St. Dominic’s CON application is a relocation of a portion of a health-care facility as contemplated under Mississippi Code Section 41-7-191(l)(b).
II. Whether St. Dominic’s CON application complies with the specific need criteria for a relocation of a portion of a health-care facility detailed in the State Health Plan.
III. Whether St. Dominic’s CON application complies with the specific need criteria for the proposed institution of obstetrical services as set forth in the State Health Plan.
IV. Whether St. Dominic’s CON application complies with the General Review Criteria as set forth in the Mississippi Certificate of Need Review Manual.
We determine that the Department did not err by finding St. Dominic’s proposed project was actually a new hospital. Because St. Dominic could not meet the need criteria for a new hospital, the Department did not err by denying its CON application, and the chancery court did not err by affirming this decision. Thus, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. St. Dominic, which is located in General Hospital Service Area 3 (GHSA), is a short-term, general, acute-care facility. At the time of its application, St. Dominic had a licensed capacity of 535 beds that included 417 medical/surgical beds, 35 chemical-dependency beds, and 83 psychiatric beds.
¶ 4. In June 2007, St. Dominic filed a CON application to build a new hospital in Madison County. St. Dominic later withdrew that application. Then, on December 1, 2008, St. Dominic filed a CON application requesting approval to relocate seventy-one beds (sixty-five general acute-care beds and six obstetric beds) from its Jackson location to a new “satellite campus” it planned to build in Madison. The project was estimated to cost $125,303,387 and would be located at the future Interstate 55/Reunion Interchange, between the existing Madison and Gluckstadt exits.
¶ 5. The application consisted of four components: (I) to relocate sixty-five licensed and operational, general, acute-care beds and related services and to construct a new facility, (II) to construct an accompanying 60,000 squarefoot medical office building, (III) to provide MRI services at the new facility, and (IV) to relocate six licensed, general, acute-care beds for obstetrical and neonatal services. St. Dominic stated that it would implement *1043 Components II, III, and IV only if the Department approved Component I.
¶ 6. In February 2009, a staff analysis recommended the application be denied. St. Dominic requested a hearing. Madison HMA, Incorporated (also doing business as Madison River Oaks), the operator of a sixty-seven-bed hospital in Canton, Mississippi, challenged St. Dominic’s CON application. The public hearing took place February 4 through February 25, 2010, and included evidence and testimony in support of and in opposition to St. Dominic’s application.
¶ 7. The hearing officer found that St. Dominic’s proposed relocation was actually a new hospital, finding (1) “the proposed project ‘does not reduce the scope of services available at the Jackson campus[;]’ ” (2) “Since St. Dominic has not identified the beds that will be relocated, there is no basis for determining if the ‘relocated’ beds are actually operational;]” (3) “St. Dominic has not identified staff that will be relocated, and acknowledges new personnel will be hired to staff the new hospital[;]” (4) “St. Dominic’s application contemplates the purchase of new equipment!];]” and (5) “St. Dominic proposed to construct a new building which, regardless of licensure classification, will be a separate hospital.”
¶ 8. After concluding that the proposed project was actually a new hospital, the hearing officer analyzed St. Dominic’s CON application under the “Certificate of Need Criteria and Standards for the Establishment of a General Acute Care Hospital.” Under the criteria, the hearing officer determined that Madison County had an existing hospital — Madison HMA. The applicable formula showed the area was “over-bedded” — Madison County with an excess of thirty-four beds and GHSA 3 with an excess of 1,300 beds. Based on these figures, the hearing officer concluded that Madison County did not need an additional hospital.
¶ 9. In addition to complying with the requirements of the State Health Plan, St. Dominic had to comply with the sixteen General Review Criteria (GRC) set forth in the CON Review Manual. The hearing officer determined that three criteria did not apply; St. Dominic passed six criteria; but St. Dominic failed to comply with the following seven criteria.
GRC 1 State Health Plan: For the reasons stated above, the hearing officer found that St. Dominic failed to comply with the State Health Plan.
GRC 3 Availability of Alternatives: Based on the evidence, the hearing officer concluded that St. Dominic had decided to build a hospital in Madison many years ago.[1] St. Dominic only considered two options: renovating/expanding its existing facility and building a second facility in Madison. Thus, the hearing officer opined that St. Dominic did not truly consider its alternatives.
GRC Jp Economic Viability: Evidence did not support a finding that the project would be profitable by its second or third years of operation.
GRC 5(a)-(d) Need for the Project: Because the proposed project would be placed in a “relatively young, wealthy population,” the hearing officer was not convinced that the motivation for the project was to improve healthcare access for low income, minority, and under-served groups. Although Madison County’s population was increasing, the growth was not significant enough to *1044 support a new hospital. The proposed facility would have a negative effect on Madison HMA. There was huge opposition to St. Dominic’s application, and St. Dominic used misleading advertising and giveaways to gain supporters.
GRC 6 Access to Facility or Service: The hearing officer determined that this project was not geared toward serving underserved groups. The proposed project would be in close proximity to eight other hospitals. And, because funding for the Reunion Interchange was lost, the facility would not be directly accessible from the highway.
GRC 8 Relationship to Existing Healthcare System: Evidence suggested that the proposed project would negatively affect the existing hospital-Madison HMA.
GRC Up Construction Projects: The Department must consider whether construction projects are designed to maximize cost containment. The hearing officer found that this criterion did not weigh in favor of St. Dominic.
¶ 10. The hearing officer also determined St. Dominic was not in compliance with the State Health Plan’s four General Certificate of Need Policies. The hearing officer stated that:
If St. Dominic is permitted to proceed with this project under the guise of a “relocation” by satisfying the need requirement with nothing more than a showing that: 1) Madison County is one of the fastest growing counties in Mississippi, 2) the current transportation system is inadequate, 3) there are parking and patient flow problems at its Jackson Campus, and 4) many Madison County residents are inconvenienced by having to drive to Jackson for healthcare, the standard will have been officially lowered from what is currently required by [law].
Because St. Dominic’s application did not comply with the statutes, the 2009 State Health Plan, and the CON Review Manual, the hearing officer denied the application.
¶ 11. The State Health Officer reviewed the hearing officer’s recommendations and concurred with the findings, denying St. Dominic’s CON application by final order dated August 26, 2010. On September 7, 2010, St. Dominic appealed to the Madison County Chancery Court. The chancellor affirmed the denial. Aggrieved, St. Dominic appealed to this Court on December 29, 2010.
¶ 12. We will include additional facts within the context of the discussion.
STANDARD OF REVIEW
¶ 13. As an appeal from an administrative agency, this Court gives great deference to the Department’s factual findings. St. Dominic Jackson Mem’l Hosp. v. Miss. State Dep’t of Health, 728 So.2d 81, 83 (¶ 9) (Miss.1998). The Legislature has instructed that:
The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
Miss.Code Ann. § 41-7-201(2)(f) (Rev. 2009).
ANALYSIS
¶ 14. The Mississippi Health Care Certificate of Need Law requires obtaining a CON from the Department before engaging in certain designated activities. See Miss.Code Ann. § 41-7-191(1) (Rev. 2009). *1045 The statute provides, in pertinent part, that:
(1) No person shall engage in any of the following activities without obtaining the required certificate of need:
(a) The construction, development or other establishment of a new health care facility,
[[Image here]]
(b) The relocation of a health care facility or portion thereof, or major medical equipment, unless such relocation of a health care facility or portion thereof, or major medical equipment, which does not involve a capital expenditure by or on behalf of a health care facility, is within five thousand two hundred eighty (5,280) feet from the main entrance of the health care facility;
[[Image here]]
(e) The relocation of one or more health services from one physical facility or site to another physical facility or site, unless such relocation, which does not involve a capital expenditure by or on behalf of a health care facility, (i) is to a physical facility or site within five thousand two hundred eighty (5,280) feet from the main entrance of the health care facility where the health care service is located, or (ii) is the result of an order of a court of appropriate jurisdiction....
Id. The Court must determine whether St. Dominic’s project is a relocation, as suggested by St. Dominic, or a new hospital, as argued by the Department and Madison HMA.
¶ 15. There is no bright-line rule by which to analyze this issue. But this Court has provided much guidance on the topic. Whether St. Dominic’s project is a relocation or a new hospital will control which standard applies to its CON application.
I. Is St. Dominic’s project a true relocation or an attempt to build a new hospital?
¶ 16. St. Dominic presented its project as a relocation, but the Department determined that the project actually was a new hospital. St. Dominic argues that the Department erred because (1) the ruling is contrary to CON law, (2) the Department misinterpreted and misapplied prior Court decisions, and (3) the decision is arbitrary and capricious because it is inconsistent with the Department’s prior decisions in identical cases. Conversely, the Department and Madison HMA argue that (1) the project actually is a new hospital, (2) the Department did not mischaracterize the project, and (3) the prior cases are distinguishable.
¶ 17. In determining whether the project is a new hospital, the hearing officer relied on this Court’s decisions in St. Dominic-Jackson Memorial Hospital v. Mississippi Department of Health, 728 So.2d 81 (Miss.1998), and St. Dominic-Madison County Medical Center v. Madison County Medical Center, 928 So.2d 822 (Miss.2006).[2]
A. Methodist
¶ 18. In the Methodist case, Methodist Medical Center filed a CON application requesting to relocate sixty-four licensed but unused beds to a new satellite campus in Northeast Jackson. Methodist, 728 So.2d at 84 (¶ 11). The Department granted the CON. Id. at 82 (¶2). On appeal, the chancellor questioned whether the Methodist project was a relocation or actually a new hospital. Id. at 82 (¶ 3). She also questioned whether the project was *1046 needed. Id. Thus, the chancellor remanded the case to the Department for review. Id.
¶ 19. On remand, the Department conducted a second hearing, determined that Methodist’s project was a relocation, and granted its CON application. Id. at 84 (¶ 11). On the second appeal, the chancellor affirmed. Id. at 82 (¶ 4). Aggrieved, St. Dominic appealed to this Court, which reversed the decision. Id. at 82 (¶ 5), 92 (¶¶ 43-45).
¶ 20. The Court questioned why the Department classified the project as a “relocation.” Id. at 84 (¶¶ 11-13). At the time, “relocation” was not defined in the State Health Plan; thus, the Department had the authority to interpret the term. Id. at 84-85 (¶ 12). “[T]he Department has the authority to define terms in a manner inconsistent with their generally accepted definition,” but the Court found the Department’s “definition of ‘relocation’ to be suspect.” Id. at 84-85 (¶¶ 12-14). The Court stated that:
The North Campus project does not constitute a “relocation” in any ordinary sense of the word. The record is clear that a completely new building was constructed in northeast Jackson, and this building has been staffed with new medical workers and new equipment. There was no corresponding decrease in services at the main hospital in south Jackson, and, although the North Campus facility lacks an emergency room, the facility is, for all practical purposes, a new hospital.
Id. at 85 (¶ 13). Although the Court determined that the Department’s interpretation of “relocation” was suspect, the Court deemed it unnecessary to determine whether the definition was arbitrary and capricious. Id. at 85 (¶ 14). Instead, the Court found the decision erroneous as a matter of law because the Department erroneously had applied a lesser standard of need when approving the alleged “relocation.” Id.
¶ 21. The Court determined “that the showing of need must be commensurate to what the project actually is ...,” and the project actually was a new hospital. Id. at 89 (¶ 27). According to evidence, GHSA 3 was over-bedded and no new hospitals had been proposed in Jackson since the passage of the CON laws. Id. at 89 (¶ 29). The Court stated that:
[W]e would question a proposal which sought to build what is, for all practical purposes, a new hospital in an affluent part of Jackson under the guise of a “relocation.” This Court also harbors reservations about a project which purports to be concerned largely with bene-fitting indigent patients, but which is located in a part of Jackson where few indigent citizens actually live.
Id. at 90 (¶ 31). The Court further explained that:
It should be readily apparent that the Department’s conclusion that new hospitals may be constructed under the guise of “relocations,” even absent any need for the new hospitals, has the potential to cause serious damage to this State’s health care system. Given the abundance of surplus licensed capacity possessed by hospitals throughout the State, this interpretation of the law has the potential to render the CON requirements a nullity. Implicit in the Department’s rationale is the assumption that, merely because a hospital is licensed to provide a certain number of beds, it necessarily follows that there is a need for these beds. The fact remains, however, that the excess licensed capacity enjoyed by many hospitals has never had to withstand CON scrutiny, and any implied presumption of need in this regard is erroneous.
*1047 Id. at 91 (¶ 36). Based on the foregoing, the Court reversed the Department’s ruling and rendered judgment, denying Methodist’s CON application. Id. at 92 (¶¶ 43-45).
B. St. Dominic 2006
¶ 22. In June 2002, St. Dominic filed a CON application requesting to build a new 100-bed hospital in Madison County. St. Dominic, 928 So.2d at 823 (¶ 3). Several months later, St. Dominic amended its application, seeking approval to relocate 100 licensed but unused beds from its Jackson campus to a facility in Madison County. Id. Madison County Medical Center opposed the application.[3] Id. at 823 (¶ 4).
¶ 23. The Department granted St. Dominic’s amended application but permitted it to relocate only fifty beds. Id. Madison County Medical Center appealed to the chancery court. Id. Relying on Methodist, the chancellor reversed the Department’s grant of the CON. Id. Aggrieved, St. Dominic appealed. Id. This Court affirmed. Id. at 830 (¶¶ 32-33)
¶ 24. The Court found the health officer’s definition of “relocation” to be suspect, but the Court determined it was unnecessary to review whether the definition was arbitrary and capricious. Id. at 828 (¶ 18). Relying on Methodist, the Court stated that “the showing of need must be commensurate to what the project actually is and the impact which it actually has on the Jackson healthcare market.” Id. at 829 (¶ 26). The Court explained that, under Mississippi Code Section 41-7-191(1), a relocation is a transfer of an entire health service. Id. at 829 (¶ 28). Thus, “the transferring facility would no longer have the authority to provide the same service.” Id.
¶ 25. The Court noted that St. Dominic’s amended application proposed to construct a new building, hire new employees, and purchase new equipment. Id. at 829 (¶ 29). The new facility would offer “surgery in four operating units; high-level imaging services; nursing care 24 hours per day, seven days per week; rehabilitation and physical therapy; pharmacy; clinical laboratories; and Level IV emergency services.” Id. The Court saw no evidence to suggest that St. Dominic would decrease or eliminate any of these services at its Jackson campus. Id. For those reasons, the Court determined St. Dominic’s amended application should have been considered under the standards for a new hospital, not a relocation. Id. at 829-830 (¶¶ 30-32). Because St. Dominic could not meet the standards for a new hospital, the Court affirmed the chancellor’s reversal. Id. at 830 (¶ 32).
C. This project is a new hospital, not a relocation.
¶ 26. The Department actually denied St. Dominic’s request in this case, unlike its decisions in Methodist and St. Dominic 2006. Still, the Court’s holdings in those cases are applicable. As mentioned previously, this Court affords great deference to the Department’s findings of fact unless those findings are not supported by substantial evidence. Miss.Code Ann. § 41-7-201(2)® (Rev. 2009).
¶ 27. St. Dominic argues that the Department failed to apply the appropriate definition of “relocation” to its proposed project. According to St. Dominic, a relocation of a portion of a health-care facility includes moving beds from one facility to another, not just services.
*1048 ¶ 28. Mississippi Code Section 41-7-191(l)(b) provides, in pertinent part, that: “(1) No person shall engage in any of the following activities without obtaining the required certifícate of need: ... (b) The relocation of a health care facility or portion thereof....” Miss.Code Ann. § 41-7-191(l)(b) (Rev. 2009). The statute does not define the terms “portion thereof.” St. Dominic relies on a note to section 100.03 of the CON Review Manual which states, in part, that:
The relocation of a health care facility is defined as the relocation of a health care facility from one physical location or site to another.
A portion of a health care facility is considered to be a wing, unit, service(s), or beds.
Based on this, St. Dominic believes its request is an authorized relocation of a portion of a health-care facility.
¶ 29. The hearing officer did not address St. Dominic’s specific argument (whether moving beds from one facility to another constitutes a relocation). Instead, the Department focused on the fact that St. Dominic did not plan to reduce its services at its Jackson campus. On appeal, the Department and Madison HMA maintain that this Court does not have to decide whether moving beds constitutes a relocation. Instead, the parties suggest that the Court must look at what the project actually is — the project is a new hospital — and any relocation criteria are moot.
¶ 30. Before determining whether the Department correctly interpreted the term “relocation” in regard to St. Dominic’s CON application, we must first determine what the project actually is. In its CON application, St. Dominic readily admitted it had no plans to reduce services at its Jackson campus. But a reduction of services is only one factor in determining whether a project is a true relocation or a new hospital.
¶ 31. In Methodist and St. Dominic 2006, the Court found that constructing a new building, hiring new medical staff, and purchasing new equipment was evidence that the proposed projects were new hospitals and not relocations. Methodist, 728 So.2d at 85 (¶ 13); St. Dominic, 928 So.2d at 829 (¶ 29). St. Dominic’s current CON application also proposes to construct a new medical building, hire new staff, and purchase new medical equipment. We do not suggest that a new building, new employees, and new equipment are individually prohibited under CON law. But the three are important factors to consider when determining what a project actually is.
1. New Building
¶ 32. Relying on testimony given by St. Dominic’s experts, the hearing officer found that the cost of the proposed facility would be comparable to that of a new healthcare facility. Scott Eddy, the architect who designed the facility, did not agree it was a new hospital. Instead, Eddy stated the facility was “a building to put relocated beds in.” But Eddy admitted he would not have designed the facility any differently if it were a new hospital:
Q: And I can go down here and ask you all of these one-by-one, but these would all be areas that you would put into a new hospital if you were building one, correct?
A: Yes.
Q: All right, sir. Now is there anything that’s not in this list that would be required if you were building a new hospital?
A: It would be enlarged, further developed.
*1049 Q: Well, this is the difference in whether you’re building a small hospital or large hospital?
A: Okay.
Q: Okay, say you’re building a small hospital. Is there anything that you would have to add to this particular component list here by description if you were not building a new hospital?
A: Not that I’m aware of.
To justify the cost, Eddy stated “we’re building a facility in the City of Madison, and I think everyone knows Mayor Hawkins’ reputation in Madison ... it’s going to have to be a higher quality level.... ” ¶ 33. Ronald Luke, St. Dominic’s health planning and CON expert, also maintained the facility was not a new hospital but an additional campus. In an email to Dan Isengole, who prepared the project’s equipment list, Luke instructed Isengole to “[njote we want to refer to it as Madison Campus, not new hospital.” But Luke agreed that the proposed facility would have “many of the same capabilities of any acute care inpatient facility that’s providing a comparable range of — or treating a comparable range of patients.”
¶ 34. In its application, St. Dominic stated the facility would operate under the same license as its Jackson campus. But no testimony was given to substantiate this claim. Noel Falls, an expert in health-care planning and CON, testified that the facility “is clearly a health care facility, separate, freestanding ... with all of the components of a general acute care hospital.” Then Falls responded to the following question:
Q.... [Hjave you found anything in your review of the State Health Plan, or the Certificate of Need Review Manual, or any other documents, for that matter, that ... say you can obtain a Certificate of Need for a facility just because its under the same license as another facility?
A. No. I mean it’s kind of an absurd proposition. It is not unusual for hospitals to operate under the same license. And ... often ... the same provider number, which is usually the basis for getting them licensed together so you can have then under one provider number.... That’s- a federal government issue really. It’s a Medicare issue primarily. But from a health planning perspective, those facilities are always counted separately as hospitals. And they always have been, and are to this day in Mississippi counted as separate hospitals.
Falls also presented evidence that Mississippi currently counts facilities operating under the same license as separate hospitals.
¶ 35. Based on this evidence, the health officer concluded that St. Dominic’s proposed facility actually was a new hospital. This finding is supported by substantial evidence.
2. New Employees
¶ 36. As indicated in Methodist and St. Dominic 2006, the addition of new staff is a relevant factor in determining whether a project actually is a new hospital. See Methodist, 728 So.2d at 85 (¶ 13); St. Dominic, 928 So.2d at 829 (¶ 29). Regarding employees, St. Dominic stated the following in its CON application:
On January 1, 2013, the emergency department, the obstetrical department and some number of medical surgical beds will immediately be opened and staffed primarily with persons already on the St. Dominic payroll. The number of additional positions required to open the campus is small relative to the St. Dominic workforce. All persons on the *1050 payroll will be employees of St. Dominic and will be assigned to either campus as the needs of the enterprise require.
¶ 37. Lester Diamond, St. Dominic’s Executive Vice-President of Operations, testified that St. Dominic planned to identify positions, not employees, needed to operate the Madison facility. Then, St. Dominic would “offer [its employees] the opportunity to have those positions once those positions are identified.” But Diamond stated that he could not identify how many positions would be needed because a hospital is a “fluid environment.”
¶ 38. Luke testified that additional positions would be added to accommodate the new facility. Luke based his opinion on St. Dominic’s expected growth rate, stating, “there’s no doubt that there will be a relatively small number of additional staff positions that will be necessary over and above what you would have if you did it all at the Jackson campus.”
¶ 39. The hearing officer did not find St. Dominic’s statements persuasive, finding St. Dominic’s intention to hire new employees as evidence that the project actually is a new hospital. We find no reason to disturb the hearing officer’s finding.
3. New Equipment
¶ 40. As stated in its CON application, St. Dominic also planned to purchase new equipment:
[R]elatively little existing equipment will be available to be moved from the Jackson campuses to the Madison Campus. Regardless of whether new or existing furniture or equipment is placed at the Madison Campus or the Jackson Campuses, a substantial amount of new furniture and equipment will be purchased .... All fixed equipment at the Madison Campus is likely to be newly purchased.
St. Dominic’s desire to purchase new equipment and beds is reiterated in the application: “Since the intention is to make all licensed general acute care beds operational, new beds and related equipment will ultimately have to be purchased whether they are placed at Madison or Jackson campuses.”
¶ 41. Diamond testified that St. Dominic planned to move existing equipment to Madison, but St. Dominic had not identified any pieces of equipment to move. The hearing officer also found the email from Luke to Isengole insightful on this point. In the email, Luke directed Isen-gole to prepare a letter and spreadsheet for Diamond, listing equipment needed for the Madison Campus. Luke instructed Is-engole that the “[quantities assume acquisition of all required furniture and equipment — does not assume [furniture and equipment] from [the] Main Campus.” During the hearing, Luke explained that his intent was to present a “worst-case scenario,” the purchase of new equipment.
¶ 42. The hearing officer was not persuaded by St. Dominic’s argument, finding that St. Dominic’s desire to purchase new equipment was evidence that St. Dominic intended to build a new hospital. This finding is supported by substantial evidence.
4. No reduction in beds and services at the Jackson campus
(A) Beds
¶ 43. As previously mentioned, St. Dominic requested to relocate seventy-one beds from its Jackson campus to Madison. However, St. Dominic failed to identify by wing, unit, floor, or rooms which beds it planned to take from the Jackson campus. When asked why St. Dominic had not identified the beds, Diamond stated, “[a]t this time, we have chosen not to identify the *1051 beds, because we don’t believe it is appropriate because those needs and beds could change over the next several years.”
¶ 44. St. Dominic’s application assumes that it will relocate beds actually in use. But evidence shows that St. Dominic had numerous empty beds throughout the years: 190 to 203 in 2006, 140 to 162 in 2007,138 to 164 in 2008, 140 to 163 in 2009, and approximately 105 in January 2010.
¶ 45. The hearing officer determined St. Dominic had many beds that were not in use, stating that “without identifying the beds that are proposed to be relocated, it is impossible to tell whether the beds that will be relocated are actually utilized.” This finding is supported by substantial evidence.
(B) Services
¶ 46. Mississippi Code Section 41-7-191(l)(e) provides that a CON is needed for “[t]he relocation of one or more health services from one physical facility or site to another physical facility or site.... ” Miss.Code Ann. § 41 — 7—191(l)(e) (Rev. 2009). In its CON application, St. Dominic stated that it did not plan to reduce the scope of services available at its Jackson campus. The hearing officer’s recommendation focused on this fact. Citing Methodist and St. Dominic 2006, the hearing officer found St. Dominic’s project was not a true relocation, because St. Dominic did not intend to reduce services at its main campus.
¶ 47. St. Dominie argues that Section 41 — 7—191(l)(e)[4] does not apply to its application, because it proposed to relocate beds under subsection (b).[5] We decline to discuss the differences between subsections (b) and (e); it is simply unnecessary in this case. Regardless if St. Dominic intended to relocate only beds and not services, the breadth of services St. Dominic plans to offer at its proposed facility supports the Department’s finding that this is a new hospital.
¶ 48. Component I, with a $2 million capital expenditure, proposes to relocate sixty-five general acute-care beds to a new facility, which will house the following services: Level IV emergency room, inpatient and outpatient surgery and endoscopy, imaging services, physical therapy, a station for emergency medical service vehicles and personnel, and a pharmacy. Component II proposes to build a 60,000 square foot medical office space. Component III proposes to provide MRI services which would require “the construction of a pad, covered walkway, and electrical connections adjacent to Component I.” Finally, Component IV, with a $2 million capital expenditure, proposes to relocate six, licensed delivery beds and to institute Level I obstetrical and neonatal services, which would require an additional 13,434 square feet. As stated by St. Dominic, “St. Dominic is proposing a new obstetrical service at the Madison Campus and not á relocation or a partial relocation of the current obstetrical service offered at the Jackson campuses.” (Emphasis added.) The wide range of services St. Dominic plans to offer evidences that the proposed project is a new fully functioning, freestanding, general acute-care hospital.
¶ 49. St. Dominic argues that:
*1052 [A] relocated portion of a hospital is just like the original hospital-but on a smaller scale. Thus, it makes perfect sense that the relocated portion of a hospital will offer and perform the same services as the original hospital.
In other words, St. Dominic argues that the accompanying acute-care services must transfer with the relocation of the general, acute-care beds. To support its argument, St. Dominic cites Wesley Health System, LLC v. Mississippi State Department of Health, 2008-SA-01276-SCT (Miss. Dec. 3, 2009), in which this Court issued a per curiam affirmance. The Court has stated that “trial courts are not free to decide issues according to authority found in unpublished [trial] court opinions.” In re Guardianship of Duckett, 991 So.2d 1165, 1181 (¶ 35) (Miss.2008). St. Dominic argued the same point before the trial court, and the trial court did not entertain the argument. But a copy of the lower court’s opinion in Wesley was submitted as an exhibit in this case. Although Wesley is not binding authority, we summarize its holding and demonstrate how Wesley is distinguishable from the present ease.
¶ 50. In Wesley, Forrest General Hospital (Forrest) filed a CON application to relocate thirty orthopedic beds to a new facility, a short distance away from its main campus. Wesley Health Sys., LLC v. Miss. State Dep’t of Health, Cause No. G2008-66 at 2 (June 20, 2008). Forrest’s current orthopedic staff and equipment also would transfer to the new facility, with few additions. Id. at 19. The facility would be adjacent to Southern Bone and Joint Specialists, a medical group consisting of ten orthopedic surgeons and other specialists. Id. at 2. Forrest indicated that its current orthopedic unit was outdated and problematic, and it needed larger rooms to accommodate patients and specialized medical equipment. Id. at 8. Forrest intended only to perform orthopaedic services at its proposed satellite campus. Because Forrest was the only Level II trauma hospital in South Mississippi, it had to maintain a certain level of orthopedic service at its main campus to accommodate trauma patients. Id. at 19. The Department found that Forrest’s request was a true relocation and granted its CON application. Id. at 3. Wesley Medical Center opposed the application. Id. The chancery court affirmed. Id. at 23-24.
¶51. St. Dominic’s case is clearly distinguishable. Forrest planned to relocate its orthopedic beds to a new facility adjacent to a specialized clinic and intended to perform only orthopedic services there. As a Level II trauma center, Forrest had to maintain a certain level of orthopedic services at its main campus for trauma patients; otherwise, Forrest would have lost its Level II trauma status. On the other hand, St. Dominic intends to provide many of the same services at its proposed Madison facility that it provides at the main campus and to build a new facility in a different county. St. Dominic also chose to pay a penalty fee instead of participating in the trauma system. Thus, unlike Forrest, St. Dominic does not have to maintain a certain level of services at its main campus to keep any trauma status. Also, Forest’s orthopedic facility would be dependent on its main campus for many services — janitorial, laundry, food, and pharmacy. Conversely, St. Dominic’s proposed Madison campus could operate independently of its Jackson campus.
¶ 52. St. Dominic’s proposed Madison campus would duplicate several services already performed at its Jackson campus. The State Health Plan prohibits the unnecessary duplication of health services. Thus, St. Dominic’s attempt to “relocate” beds to Madison to build a mini version of its Jackson campus must fail.
*1053 II. Whether St. Dominic’s CON application complies with the specific need criteria for a relocation of a portion of a health-care facility detailed in the State Health Plan.
¶ 53. The hearing officer reviewed whether St. Dominic’s application complied with the specific need criteria for a new hospital and found that it does not. St, Dominic argues that its CON application complies with the specific need criteria for a relocation under Section 108.03 of the State Health Plan.
¶ 54. Mississippi State Health Plan Section 108.03(l)(a), or the “[CON] Criteria and Standards for Construction, Renovation, Expansion, Capital Improvements, Replacement of Health Care Facilities, and Addition of Hospital Beds,” provides the review criteria for projects which do not involve the addition of any acute-care beds. Since St. Dominic’s project is a new hospital, the Department argues that this relocation criterion does not apply. We agree. St. Dominic’s project should be reviewed under the specific need criteria for the establishment of a new hospital— Section 108.02.
A. St. Dominic fails to comply with the CON criteria and standards for the establishment of a general acute-care hospital.
¶ 55. Section 108.02, or the “Certificate of Need Criteria and Standards for the Establishment of a General Acute Care Hospital,” provides that:
The [Department] will review applications for a [CON] to construct, develop, or otherwise establish a new hospital under the applicable statutory requirements of [Mississippi Code] [s]ections 41-7-1173, 41-7-191, and 41-7-193 ... [Department] will also review applications for [CON] according to the general criteria listed in the Mississippi Certificate of Need Review Manual; all adopted rules, procedures, and plans of the [Department]; and the specific criteria and standards listed below.
1. Need Criterion: The applicant shall document a need for a general acute care hospital using the appropriate need methodology as presented in this section of the Plan. In addition, the applicant must meet the other conditions set forth in the need methodology.
Section 108.01(b) contains the appropriate need methodology for this project.
¶ 56. Section 108.01(b) states that “the [Department] shall use the following formula to determine the need for an additional hospital in a county with an existing hospital.” Madison County has an existing hospital — Madison HMA. Section 108.01(b) explains that “[t]he formula is calculated for each facility within a given General Hospital Service Area (GHSA); then beds available and beds needed under the statistical application of the formula are totaled and subtracted to determine the bed need or excess within each GHSA.”[6] The Department may consider approval of a hospital with a maximum of 100 beds if the GHSA needs 100 or more beds, the project has strong community support, and the project is economically feasible. Under the formula, Madison County has an excess of thirty-four beds, and GHSA 3, which includes Madison County, has an excess of 1,300 beds. As a result, Madison County does not need an additional hospital. Thus, St. Dominic fails to comply with the CON criteria and standards for the *1054 establishment of a general acute-care hospital.
B. St. Dominic’s CON application does not comply with the State Health Plan’s General CON Policies.
¶ 57. Because Madison County and GHSA 3 are over-bedded, the Department could not approve St. Dominic’s project. In an abundance of caution, the Department continued with its analysis, determining whether the application complied with the State Health Plan.[7] The Department determined that St. Dominic had failed to comply with these policies. St. Dominic maintains that it is in substantial compliance with all four policies. But based on the Court’s resolution of the previous issues, this issue is moot.
III. Whether St. Dominic’s CON application complies with the General Review Criteria as set forth in the Mississippi CON Review Manual.
¶ 58. Out of an abundance of caution, the Department also considered whether St. Dominic complied with the sixteen GRC set forth in the CON Review Manual. The hearing officer determined that three GRC criteria did not apply to this application.[8] St. Dominic passed six criteria.[9] But the hearing officer determined that St. Dominic had failed to comply with seven criteria.[10] As previously stated, because Madison County and GHSA 3 are over-bedded, the Department could not have approved St. Dominic’s project. This issue also is moot.
IV. Whether St. Dominic’s CON application complies with the specific need criteria for the proposed institution of obstetrical services as set forth in the State Health Plan.
¶ 59. St. Dominic stated that it would not pursue Components II, III, and IV of its proposed project if the Department did not approve Component I. Component I was not approved. Thus, this argument is moot.
CONCLUSION
¶ 60. This case is a classic example of wants versus needs. St. Dominic wants to build a hospital in Madison County but, currently, the need does not exist. In Methodist and St. Dominic 2006, the Court held that CON applications should be reviewed based on what the project actually is. The Department correctly applied those holdings to this case and ruled that St. Dominic’s proposed project is — for all intents and purposes — a new hospital, not a relocation. St. Dominic failed to meet the applicable standards for a new hospital. Therefore, the chancery court did not err by affirming the Department’s *1055 denial of St. Dominic’s CON application. For these reasons, we affirm the chancellor’s judgment.
¶ 61. AFFIRMED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.

. Evidence suggests that St. Dominic had picked the location of its proposed project well before retaining some of its experts.

. Because the current case and the cited cases all involve St. Dominic, we refer to the cases as Methodist and St. Dominic 2006, respectively.

. At the time, Madison County Medical Center had a pending CON application, requesting to move its entire sixty-seven-bed hospital from Madison County to Hinds County. The Department denied the request. St. Dominic, 928 So.2d at 823 (¶¶ 5-6).

. Section 41 — 7—191 (1 )(e) provides, in part: "No personal shall engage in any of the following activities without obtaining the required certificate of need.... The relocation of one or more health services from one physical facility or site to another physical facility or site....”

. Section 41-7-19l(l)(b) prohibits relocating a health-care facility or portion thereof without obtaining a certificate of need.

. The Department uses the following formula to determine the need for an additional hospital in a county with an existing hospital: ADC + K(ADC). “ADC” means "Average Daily Census,” and "K” refers to the "Confidence Factor,” which equals 2.57.

. The State Health Plan provides four General CON policies: (1) to improve the health of Mississippi residents; (2) to increase the accessibility, acceptability, continuity and quality of health services; (3) to prevent the unnecessary duplication of health resources; and (4) to provide some cost containment.

. GRC 9 (availability of resources), GRC 13 (special needs of other entities), and GRC 15 (competing applications).

. St. Dominic complied with GRC 2 (long-range plan), GRC 7 (information requirement), GRC 10 (relationship to ancillary or support services), GRC 11 (effect of project on clinical needs of health professional training programs), GRC 12 (access by health professional schools), and GRC 16 (quality of care).

.See supra 9. St. Dominic failed to comply with GRC 1 (State Health Plan), GRC 3 (availability of alternatives), GRC 4 (economic viability), GRC 5 (need for the project), GRC 6 (access to facility or service), GRC 8 (relationship to existing healthcare system), and GRC 14 (construction projects).